# FEBRUARY 21, 1945

FRITZ DINKLAGE V. THE STATE.

No. 23055. Delivered February 21, 1945.

124

The opinion states the case.

*Darroch & McCartney* and *Gib Callaway,* all of Brownwood, for appellant.

*M. M. White,* Dist. Atty., of Belton, *F. O. Jaye,* Sp. Prosecutor, of De Leon, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged with the unlawful killing of Gene Wilson, and upon his trial he was given a sentence of twenty-five years in the penitentiary.

Appellant and his wife were the proprietors of a dance hall near the town of Priddy in Mills County. On June 7, 1944, the

deceased, Gene Wilson, was shot and killed by appellant. There had been bad feeling engendered between the parties to this tragedy, Mr. Wilson, the deceased, having engaged in some previous difficulties at appellant's place of business, and by reason thereof he had been ordered not to return to such place. On the night of the homicide the deceased and a woman drove up in front of appellant's place of business, and upon being informed of the deceased's presence appellant possessed himself of a pistol and went out to the car in which the deceased and this woman were sitting and accosted them; whereupon, after some words, appellant shot the deceased, the evidence showing a wound in the leg that evidently went into the abdomen, and a fatal wound in the throat that severed some vital organs.

The testimony showed that appellant and his wife were both fifty years of age. That appellant was crippled in the right hand; that he was suffering from varicose veins in one leg that necessitated the wearing of a bandage thereon, and that the foot on the other leg had been broken and he was lame therein. The deceased was a young man, strong and active, and well able to take care of himself in a physical encounter, in which he had a fair amount of experience. Appellant was born in Washington County, Texas, and had lived there and in Mills County most of his life.

Bill of exceptions No. 1 complains of the closing argument of the district attorney as follows: "Gentlemen of the jury, the counsel for the defendant would have you disregard the testimony of the two eye witnesses for the State as to the manner in which the shooting of the deceased took place," and then turning facing the defendant, and pointing his finger directly at him, he further said in a loud and vehement tone of voice,—"and wants you to believe the story of that Hun and his wife," with much emphasis on the word "Hun." Upon objection thereto, same was sustained, and while the court was instructing the jury to disregard said statement and argument of the district attorney, he, said attorney, then turned in the direction of the defendant and emphatically stated: "He is a German." This bill then continues and shows that one of the State's witnesses was attired in a soldier's uniform of the United States Army, and at such time the United States was engaged in war with the German government; that there was no evidence admitted before the jury that defendant was a "Hun" or a German; that such a reference was highly prejudicial, inflammatory and so calculated to arouse the passions and prejudices of the jury that an instruction from the court to disregard the same could not eradicate the harmful effect thereof.

This bill is qualified by the trial court with the statement "that the attorneys for the defendant in their examination of witness and in their argument to the jury before the district attorney's argument had referred to the State's witness, Gaetano Imbardino as a 'Wop' and 'Mussolini'."

While such a reference to the State's witness should not have been made, and is not conducive to fair and dignified trials in our courts, nevertheless we think there is a vast difference as to unfair ridicule of a witness and unfair ridicule or abuse of the person on trial before the jury. That appellant was an American citizen cannot be denied, he having been born in Texas, and lived there all his life; that his ancestry came from Germany might be inferred from his name alone, there being no testimony as to the nationality of his parents, and taking into consideration the strained relations between the people of these United States and the natural feeling of enmity upon their part towards anything emanating from the German government, we feel that such an unfortunate allusion to appellant as a "Hun" would be commonly understood to mean a "German" or a person of barbarous or cruel disposition,—see Webster's International Dictionary,—and again while the trial court was instructing the jury to disregard such an allusion, the statement was made "He is a German." These statements should not have been made, and we are of the opinion that their harmful effect could not have been obliterated by an instruction of the court, especially in the light of the practical repetition thereof while the court was attempting to withdraw the first remark from the jury. If one's name could be used to evidence one's nationality, it is a matter for wonder as to what confidence could be properly placed in some of our great leaders in this present struggle against the Axis powers. Nor do we think the allusion to a witness as a "Wop" and "Mussolini" was sufficient to call forth this challenge to appellant's citizenship and allow the denunciation complained of in this bill.

Bill No. 2 complains of the district attorney's denunciation of appellant as "the operator of that hell joint." While such was rather severe, still we do find that this place, called by many a "honkytonk" seemed to be filled with fighting women as well as men, and a resort where disorder seemed to be the rule rather than the exception, and the attorney seemed to be giving his opinion, doubtless gathered from and based upon the evidence.

Bill No. 3 complains because the State was allowed to prove that appellant's wife, Mrs. Fritz Dinklage, had clubbed a girl with a long spoke out of a wagon wheel. We do not think that

the clubbing of this girl by appellant's wife had any bearing on the guilt or innocence of appellant, and it should not have been admitted. To the same effect is bill No. 13, which will be governed by this ruling.

Bill No. 4 relates to the State having proved, over appellant's objection, that the witness Evans had never known of the deceased having started a fight with anyone. Upon appellant's objection to said question and its answer, appellant also requested the court to instruct the jury to disregard the testimony thus objected to. The court refused to do so, but on the following day the trial court did instruct the jury not to consider such testimony. In giving the belated instruction the trial court acted properly, because, in our judgment, the testimony should not have been heard. Testimony was offered and heard relative to deceased's reputation as a peaceable law-abiding citizen, and witnesses testified that such reputation was good, and that is as far as we think the State should have been allowed to go. While reputation necessarily is taken out of the realm of prohibited hearsay, the testimony complained of herein is hearsay, and does not come under the exception of reputation.

Bill No. 5 relates to whether the witness ever "heard Gene Wilson speak a threat against anybody's life in all the years you knew him?" and although it does not appear from the bill that such question was answered, it was objected to as an improper way of showing the deceased to have been of a quiet and inoffensive disposition, and we think the matter was objectionable.

Bill No. 6 relates to an occurrence that took place in appellant's place of business, wherein it was shown that the deceased took to task some soldiers whose collars were unbuttoned and neckties were not in proper order, and that he and the soldiers went out of the dance hall and presumably had a difficulty on the road near the hall. In order to justify or explain deceased's attitude in this matter, the State placed on the witness stand one W. J. Wilson, otherwise known as "Dub," a brother to deceased, who was permitted to detail certain instructions given to military police in regard to the enforcing the proper wearing of ties, collars and uniforms upon the part of soldiers, and also what would be done with a person in the service who failed to have himself dressed in accord with certain military regulations. "These regulations were taught anyone when entering the army, and they go with him wherever he goes." The bill shows that no testimony was present showing appellant's familiarity with army regulations, nor on the occasion in question that deceased was acting as a military policeman, and it is shown by testi-

mony that deceased was not in the uniform of a soldier, but was dressed as a civilian. In the absence of any showing that appellant was familiar with such regulations and that deceased was operating thereunder, we do not think the testimony complained of was admissible.

Bill of exceptions No. 7 relates to the testimony of Joe F. Underhill, city marshall of the town of DeLeon in Comanche County. He testified that the deceased frequently visited in his home town in company with Max Sinclair, a son of the sheriff of Comanche County, and to the question: "During that time did you observe on the part of Gene Wilson any sort of misconduct, * * * did he, during all that time that the sheriff's son and Gene Wilson would come to DeLeon, did you observe any misconduct of any nature whatsoever on the part of Gene Wilson?" Whereupon the court halted said inquiry and instructed the jury not to consider said question. We think the trial court was correct in halting such inquiry; it was not a proper way to prove general reputation.

Bill No. 8 complains because a witness, Yvonne Brooks, had not been placed under the rule as had all other witnesses, and who had heard practically all the testimony in chief of both sides, which did not include the character witnesses, and such witness, in order to combat certain testimony of appellant's wife relative to deceased's appearance and conduct at the dance hall on Christmas Eve night of 1943, testified that she and deceased became engaged on that night, and deceased gave her an engagement ring at such time, and that was at her home in Albany, Texas, at about 8 o'clock at night. It is shown that this witness had not been under the rule, and had heard practically all the testimony of the witnesses, some of whom had testified prior to Mrs. Dinklage, and had placed deceased at the dance hall on such Christmas Eve night at about the time Miss Brooks placed him at her home in Albany, Texas. We think the witness should have been placed under the rule, if possible, but if the court had exercised his discretion and allowed her testimony, we see no error therein.

Bill No. 9 merely relates to the father of deceased testifying to the fact that his son, after his discharge from the army, had a present in the home of the witness "before he started up to see Miss Brooks, * * * there were packages and bundles with Yvonne Brooks' name on it." It is not shown when this happened, and the proof seems to be rather indefinite, and as set forth in the bill has no materiality.

Bill No. 10 relates to the following question and answer propounded to Jim Moody, a witness who had a difficulty with the deceased: "You regarded Gene Wilson as being a good honest boy, didn't you?" to which witness answered: "Yes, sir." There was no attack made on the character of deceased as to his honesty and fair dealing, and this was not a proper question relative to deceased's reputation as a peaceable law-abiding citizen, which had been put in issue by the State. Bill No. 11 relates to the same witness testifying that: "I never did know of Gene Wilson, the deceased, carrying a deadly weapon. I never did hear of him using a deadly weapon in any scrap that he ever had." This testimony was withdrawn from the jury on the following day; it was not permissible testimony in the first instance; it was clearly hearsay, and should have been excluded by the trial court.

Bill No. 12 relates to a witness, Wanda Jean Clark, who the testimony shows was knocked down by the deceased, in a fight at this dance hall, and who became unconscious; that she was with child at such time and within two days thereafter she had a miscarriage and lost her child. The private prosecutor then asked her the following question: "You had a venereal disease when you were pregnant with the child?" to which said witness answered "No." She was then asked the following question: "and that is what created the abortion?" to which she answered "That's not true." While there might be some possibility of this questioning being proper, but same is not apparent to us, and we do not think same added to but rather detracted from the dignity of this trial, and unless the attorney was in possession of certain information and possible proof of the presence of this disease, such should not have been indulged in by the State.

Bill No. 13 complains of the following question to and answers by Imogene Graham: "Were you there when she (Mrs. Fritz Dinklage) nearly beat a girl to death with a wagon spoke?" to which the witness answered: "Yes sir. * * * Who was that girl?" Answer: "Mary Davenport." The court permitted this matter to go before the jury, but withdrew the same on the next day. This was inadmissible testimony, and should not have been admitted, but we do not say that the court's belated withdrawal came too late. Mrs. Dinklage was not on trial before the jury.

We are under the impression that many of these bills evidence error, some of them minor ones and some serious, and some of them did not conduce to the fairness of this trial. Bill No. 1 evidences a serious error, and an occurrence that should not have happened. We are a melting pot of many nationalities,

130

races, creeds and colors, and to charge one at the present time with being a Hun and a German, although born in Texas, leads us to conclude, when taken with other lessor errors found herein, that appellant has not had a fair trial.

The judgment is therefore reversed and the cause remanded.